UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**General Power Products, LLC,**

    **Plaintiff,**

-V-                                     **Case No. 1:06-cv-00143**
                                                **Judge Michael H. Watson**

**MTD Products, Inc., et al.,**

    **Defendants.**

## OPINION AND ORDER

Plaintiff asserts state law claims of tortious interference with business relationship and contract, misappropriation of trade secrets, unfair competition, unjust enrichment, and fraud. Plaintiff seeks damages and injunctive relief. The Court has federal subject matter jurisdiction under the Convention on Recognition of Foreign Arbitral Awards, 9 U.S.C, § 201 *et seq.* This matter is before the Court on plaintiff's motion for a preliminary injunction (Doc. 35). For the reasons that follow, the Court denies plaintiff's preliminary injunction motion.

### I. Facts

This action arises from the efforts of plaintiff General Power Products, LLC ("GPP") to secure the exclusive right to distribute small engines made by defendant

Chongqing Zongshen General Power Machine Co., Ltd. ("Zongshen"), and defendant MTD Product Inc.'s ("MTD") alleged interference with those efforts.

GPP is an Ohio limited liability company engaged in engineering, designing, manufacturing, and distributing engines and utility equipment to the outdoor power equipment industry. Defendant MTD is a Delaware corporation in the business of designing and manufacturing lawnmowers and outdoor garden equipment. It supplies its products to retailers such as Wal-Mart, Lowes and Home Depot. Defendant Zongshen is a Chinese company that manufactures a wide variety of equipment, including outdoor power equipment.

In early 2003, MTD considered Zongshen as a potential supplier of engines. Sample engines failed to meet U.S. standards, however, and MTD determined it would not buy engines directly from Zongshen.

In 2003 and through early 2004, GPP made several improvements to Zongshen engines. On March 12, 2004, GPP and Zongshen entered a memorandum of cooperation ("MOC"). The MOC stated, "GPP expects to cooperate with [Zongshen] to develop the global market of industrial engines and application products." The MOC also provided, "GPP will be the exclusive marketer in North America and Europe markets for GPP Products to the Original Equipment Manufacturers ('OEMs') and retail customers listed in Annex 3 (the 'Customers'); while [Zongshen] has no rights to sell GPP Products either directly or indrectly or through the third party to those Customers." The MOC defined "GPP products as "the products and associated parts [for] which GPP has carried out all of the following tasks based on [Zongshen] Products: improving design, lowering the cost for same functionality, customer styling, application

implementation (the 'Improvements') and acquisition of all necessary governmental certificates (the 'Certificates') within this Memorandum." Under the MOC, GPP and Zongshen agreed that the intellectual property resulting from the Improvements would be owned jointly by Zongshen and GPP.

The MOC further provided, "[t]he memorandum will be effective only after all Annexes are mutually agreed and signed by both parties." It is undisputed that neither GPP nor Zongshen ever approved or signed Annex 6 to the MOC.

On March 25, 2004, representatives from GPP and MTD met and discussed MTD buying Zongshen engines from GPP. At the meeting, GPP informed MTD about GPP's exclusive distributer status. MTD asked GPP to design a specific and specialized Zongshen engine for MTD's outdoor power products. GPP then undertook improving the Zongshen engine to meet U.S. standards and MTD's requirements throughout the spring, summer and fall of 2004. GPP's improvements included: implementing a dam fix to remedy an oil burning problem to meet EPA compliance; remedying the quality of rubber hoses on the Zongshen engine; designing a new carburetor screw to meet U.S. and California emissions standards; and improving Zongshen's manufacturing techniques to remedy a stop brake system in order to meet U.S. standards. GPP avers that it took reasonable steps to maintain the secrecy of its improvements by maintaining security at its facility and requiring clients, customers and employees to sign confidentiality agreements.

On October 15, 2004, Chairman Zuo of Zongshen sent a letter to GPP's President, Dan Lehr, inviting him to China to discuss seven concerns as detailed in the letter. On October 26, 2004, Zongshen, through its counsel, sent GPP a letter

terminating their business relationship. The letter stated that the MOC was not effective because the parties never signed or agreed to the Annexes, and that GPP had in any event breached the MOC. On January 27, 2005, MTD sent a letter to Lehr expressing MTD's understanding that there was no relationship between MTD and Zongshen that would preclude Zongshen from dealing directly with MTD, and that MTD would therefore work directly with Zongshen to develop and obtain engines for MTD's products.

In late January 2006, GPP learned that MTD was selling a high volume of lawnmowers with Zongshen engines at Wal-Mart stores in the United States. In early February 2006, GPP bought an MTD lawnmower at a Cincinnati, Ohio Wal-Mart. GPP inspected the lawnmower, and contends that it contains GPP improvements and trade secrets. On February 8, 2006, GPP learned that MTD had entered a long-term exclusive distribution agreement with Zongshen and that as a result MTD had world-wide exclusive rights to sell Zongshen engines.

Plaintiff originally filed this action in the Clermont County, Ohio Court of Common Pleas. Zongshen removed the action to this Court with MTD's consent on March 15, 2006 on the basis of federal subject matter jurisdiction under the Convention on Recognition of Foreign Arbitral Awards, 9 U.S.C, § 205. GPP filed a second amended motion for preliminary injunction on February 21, 2006 (Doc. 3) and again on March 28, 2006 (Doc. 35). MTD filed its response on March 28, 2006. GPP thereafter filed various amended and supplemental reply briefs, the last of which was filed on October 6, 2006. Following limited discovery, the Court conducted a hearing on GPP's preliminary injunction motions on June 23, 2006.

## II. Standard of Review

The Court considers four factors in determining whether to issue a TRO or preliminary injunction:

> 1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363 F.3d 427, 432 (6th Cir. 2004). The factors are not prerequisites; rather, they must be balanced. Capobianco, D.C. v. Summers, 377 F.3d 559, 561 (6th Cir. 2004).

## III. Discussion

### A. Likelihood of success on the merits

GPP seeks a preliminary injunction based upon two claims: (1) tortious interference with contract; and (2) misappropriation of trade secrets.

#### 1. Tortious interference

GPP argues that MTD tortiously interfered with GPP's exclusive distributer agreement with Zongshen. Under Ohio law, to establish a claim of tortious interference with contract, the plaintiff must demonstrate: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) the alleged wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Power Marketing Direct Co. v. Ball*, No. 05-4149, 2006 WL 3390373, at * 2 (6th Cir. Nov. 22, 2006)(cting *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 (1999)); *see also Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415 (1995)(syllabus ¶ 2).

MTD argues GPP cannot establish the existence of a contract between GPP and Zongshen. GPP does not cogently respond to this argument. The MOC provided, "[t]he memorandum will be effective only after all Annexes are mutually agreed and signed by both parties." It is undisputed that neither GPP nor Zongshen ever approved or signed Annex 6 to the MOC. The Court finds that the failure of GPP and Zongshen to agree to and sign Annex 6 to the MOC casts significant doubt on whether an enforceable contract existed between GPP and Zongshen.

In addition, Zongshen represented to MTD that the MOC did not prevent Zongshen from selling engines to MTD. Also, Zongshen told MTD it had terminated its business relationship with GPP. As reluctant as the Court is to accept the representations of Zongshen as truthful, GPP has failed to establish the certainty of an ongoing contractual relationship between Zongshen and GPP. Given these facts, uncertainty exists as to whether GPP has made a strong showing that MTD knowingly and intentionally procured a breach of the MOC.

For the above reasons, the Court cannot say that GPP has demonstrated a strong likelihood of success on the merits of its tortious interference claim. This weighs against the issuance of a preliminary injunction.

### 2. Misappropriation of trade secrets

GPP next argues MTD misappropriated GPP's trade secrets embodied in the improvements GPP made to Zongshen's engines. The Ohio Revised Code defines "trade secret" as follows:

> "Trade secret" means information, including the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method,

> technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

Ohio Rev. Code § 1366.61(D).

MTD argues GPPs improvements are generally known or are readily ascertainable by proper means. For example, the use of break-off head carburetor screws has been generally known since as early as 1996. Likewise, the use of braided rubber fuel hose is the industry standard in the United States. The use of fixed lengths of fuel hose to avoid kinks is also generally known and in any event readily ascertainable by proper means.

GPP's dam plate fix was derived from an existing Honda engine. Hence, the dam plate fix was readily discoverable through reverse engineering of another manufacturer's engine. The brake lever arm geometry was arrived at by looking at Honda and Briggs & Stratton engines and making some straightforward calculations. Plaintiff also failed to adequately demonstrate that the pull back spring on the MTD engines actually relies on GPP's design. Lastly, MTD demonstrated that all of GPP's improvements are all readily ascertainable from GPP's Zongshen engines, and that costly reverse engineering would not be required to discover the improvements. In sum, MTD has submitted substantial evidence casting doubt on the trade secret status of GPP's improvements to Zongshen's engines. For this reason, the Court concludes

that GPP has not demonstrated a strong likelihood of success on its misappropriation of trade secret claim. This factor weighs against granting a preliminary injunction.

## B. Irreparable harm

GPP argues that it will suffer two forms of irreparable harm in the absence of an injunction. First, GPP maintains that it will be driven out of business if an injunction is not issued. Second, GPP asserts MTD's alleged use of GPP's trade secrets constitutes irreparable harm.

GPP's arguments are flawed in several respects. GPP has not affirmatively demonstrated that it will go out of business if the Court fails to grant a preliminary injunction. In this regard, the Court notes that GPP has remained in business since it filed this action early in 2006, and it has continued to fund extensive litigation. Moreover, GPP became aware between February 4, 2005 and March 19, 2005 that MTD had shipped 10,000 Zongshen engines to Hungary[1], yet GPP inexplicably waited until early 2006 to file its lawsuit. Under these circumstances, the Court finds that GPP has an adequate remedy at law in its claim for monetary damages.

Furthermore, GPP fails to explain how enjoining MTD will prevent harm to GPP. The harm to GPP results principally from its inability to purchase Zongshen engines. The injunction GPP seeks against MTD would not force Zonshen to recognize, comply with, or reinstate the MOC or otherwise require Zongshen to sell its engines to GPP. Accordingly, merely enjoining MTD would do little to stem the alleged harm GPP has suffered.

---

[1] Hungary was part of GPP's exclusive European territory under section 1.1.4 of the MOC.

GPP also maintains it has and will sustain irreparable harm as a result of MTD's continued use of GPP's trade secrets. For the reasons stated above, the Court has already concluded that significant doubt exists as to whether GPP's improvements constitute trade secrets. In the absence of a strong showing that GPP's improvements are trade secrets, GPP also cannot show that it will suffer irreparable harm. Additionally, on top of the 10,000 Zongshen engines already shipped to Hungary, thousands of MTD lawnmowers with Zongshen engines have been shipped to major retailers, and presumably sold to consumers, across the United States. As a result, GPP's readily ascertainable improvements have been widely distributed. If GPP has suffered harm, a substantial portion of that harm cannot be undone.

For the above reasons, the Court finds that GPP has not demonstrated irreparable harm. GPP's failure to establish irreparable harm weighs against the issuance of injunctive relief.

### C. Harm to others

Both parties address this factor as a balancing of injuries. GPP argues that an injunction would not significantly harm MTD given the company's net worth, and the fact that an injunction would affect only two models of lawnmowers. MTD contends an injunction would substantially impair its ability to obtain inexpensive, quality engines that it helped to develop.

The chief harm to GPP is its inability to obtain Zongshen engines. As noted above, the requested injunction would not force Zongshen to do business with GPP. Thus, an injunction would not return the parties to the positions they were in before Zongshen terminated its business relationship with GPP. The Court finds that an

injunction would harm MTD without providing significant benefit to GPP. Therefore, the balance of harm and benefit weighs against granting injunctive relief.

### D. Public interest

GPP asserts that an injunction would serve the public's interests in protecting trade secrets and maintaining commercial ethics. MTD maintains that an injunction would have a chilling effect on business and would undermine the ability of parties to designate conditions precedent to their contracts. Moreover, MTD contends an injunction would harm public interests by restraining sources of supply and competition, and could result in the loss of jobs.

Although the public has an interest in protecting trade secrets, GPP has not made a strong showing that its improvements to the Zongshen engines constitute trade secrets under Ohio law. In addition, upon the current record, the Court finds the public interest would not be served by the recognition of a contract for which conditions precedent appear to remain unsatisfied. Lastly, the Court finds that the public interest may be harmed to some extent by the interruption of the availability of inexpensive lawnmower engines. For these reasons, the Court concludes public interests weigh against the issuance of an injunction.

All of the relevant factors weigh against granting preliminary injunctive relief. A preliminary injunction is therefore not appropriate in this case.

## IV. Disposition

For the above reasons, the Court **DENIES** GPP's motion for a preliminary injunction (Doc. 3 and Doc. 35).

**IT IS SO ORDERED.**

_____
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**